Newman *v.* Newman, Appellant.

Argued September 25, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ. (GUNTHER, J., absent).

*Russell S. Machmer,* for appellant.

No argument was made nor brief submitted for appellee.

OPINION BY ROSS, J., January 17, 1952:

The plaintiff, Edna Mae Newman, filed her complaint in the Court of Common Pleas of Northumber-

land County, praying for a divorce a.v.m. on the ground of adultery. The defendant answered the complaint, denying adultery and setting up recrimination as an additional defense. The case was referred to a master who, after several hearings, filed a report in which he recommended that the complaint be dismissed. To this report the plaintiff filed exceptions. The court below sustained the plaintiff's exceptions which complained of the finding of the master that the plaintiff had not proved adultery, but nevertheless refused a divorce because the plaintiff was "chargeable with misconduct approaching indignities" and that she was "not the innocent and injured spouse". From that order this appeal was taken.

The parties to this action were married on May 20, 1937 and separated April 8, 1949. At the time of the hearings the plaintiff was 37 years of age and the defendant 40. No children were born of the marriage. The events upon which this action is predicated are alleged to have occurred subsequent to July 1944, when the defendant was employed by an insurance firm at its office in York. Employed in the same office was Lucille Shillito, a married woman, the named co-respondent in this case.

The plaintiff testified that in August of 1945 she noticed a change in her husband; that he refused to have sexual intercourse with her and spent more time away from home. At about the same time she found certain letters written to her husband by Lucille Shillito. The letters show clearly that the association between defendant and the writer was far more than mere friendship. The plaintiff testified further that her husband received "many" telephone calls from Mrs. Shillito.

In October of 1945, according to the plaintiff, the defendant told her that he was going to a business

meeting in Columbus, Ohio, and did in fact go away from home for a period of five days. Upon his return, she "told him she had seen correspondence to the effect where he planned to meet her [Lucille Shillito] in Pittsburgh". The defendant is then alleged to have admitted sexual intercourse with the co-respondent in a Pittsburgh hotel on *October 26, 1945.*

The plaintiff testified to a visit at her home by Mrs. Shillito, who carried a small child in her arms. When the defendant came home, the co-respondent stated in his presence that he was the father of the child and he did not deny the accusation. The plaintiff then asked him why he had bought a ring which Mrs. Shillito was wearing and he replied, "Well, it isn't a diamond." Following this unpleasantness, he drove away with Mrs. Shillito and the child. Upon his return, the plaintiff asked him why he gave Lucille Shillito "all that money and paid her expenses at the hospital" and he replied, "I did it to help her out."

Mrs. Shillito, called by the plaintiff as for cross-examination, refused to answer any question bearing on her association with the defendant on the ground that to do so might tend to incriminate her. She did, however, admit that she had been "in Pittsburgh . . . around the end of October 1945". The defendant also asserted the privilege and refused to answer questions concerning his relations with the co-respondent.

"It is a rule of policy . . . not to found a sentence of divorce on confession alone. Yet, where it is full, confidential, reluctant, free from suspicion of collusion, and corroborated by circumstances, it is ranked with the safest proofs [of adultery]." *Matchin v. Matchin,* 6 Pa. 332, 337. See also, *Morse v. Morse,* 81 Pa. Superior Ct. 602; *Stanziola v. Stanziola,* 361 Pa. 209, 64 A. 2d 807. *Wigmore on Evidence,* 3rd ed., sec. 2068, states that the rule requiring that a confession of adultery be sup-

ported by corroboration is "founded on the rooted propensity . . . to resort to a false confession of guilt in order to secure freedom from the marriage tie in cases where no legally recognized cause for its dissolution really exists."

To review the testimony tending to corroborate defendant's confession: Less than a year after defendant became acquainted with the co-respondent, he refused to cohabit with the plaintiff as husband and wife and that condition continued down to the date of the hearings. Lucille wrote letters to the defendant in which she expressed love for him, and told him how much she missed him when he was away from her. The defendant's confession involved an assignation with the co-respondent in a Pittsburgh hotel and she admitted being in Pittsburgh *at that time*. The defendant failed to deny her statement that he was the father of her child, and on the same occasion admitted buying a ring for her, giving her money and paying a hospital bill for her. And finally the defendant stated to a neighbor that he was "infatuated with that woman", referring to the co-respondent. We agree with the court below that the defendant's confession of adultery with Mrs. Shillito was sufficiently corroborated by circumstances.

The Divorce Law of May 2, 1929, P. L. 1237, sec. 52, 23 PS 52, provides, inter alia: "In any action or suit for divorce for the cause of adultery, if the respondent shall allege and prove, or it shall appear in the evidence, that the libellant has been guilty of a like crime . . . it shall be a good defense and a perpetual bar against the same." In *Isaacs v. Isaacs,* 149 Pa. Superior Ct. 508, 27 A. 2d 531, we had occasion to construe this provision of our divorce law. In that case, speaking through Judge, now President Judge, RHODES, at page 512, we stated: "Since the statutory defense of recrimination is based upon the commission of adultery by the libellant, the burden is on the respondent to prove it. . . . The evidence

necessary to prove recrimination must have the same degree of certainty to establish the existence of the charge of adultery against the respondent."

To support his defense of recrimination, the defendant alleged and attempted to prove that the plaintiff had committed adultery with one Carl Smith. Defendant called his niece, Letha Mae Newman, and a friend of hers, William Smeltz. Letha Mae Newman testified that in *December of 1946* she saw the plaintiff get out of Smith's car at midnight and "tiptoe" into her home. Both witnesses stated that in *August of 1948* they saw Smith's car parked on a country road about 11 P.M., the witness Newman testifying that she saw only the plaintiff in the back seat of the car, and the witness Smeltz stating that both plaintiff and Smith were in the back seat. The witnesses testified to an occasion when they followed the plaintiff, driving her own car, to a place near a church. The plaintiff parked her car, joined Smith and drove off with him in his car. Miss Newman and Smeltz followed them to a store where the to the car, she and Smith drove off again. The witnesses plaintiff made some purchases. Upon plaintiff's return attempted to continue their surveillance, but lost the Smith car. They returned to where the plaintiff had parked her car and observed the return of Smith and the plaintiff to that point less than an hour later. The defendant's other witness was a service station operator who testified that on a night in *December of 1947* about midnight, Smith appeared at his service station "pretty well decorated with lipstick", seeking help to remove his car from a ditch. The witness accompanied Smith to his car, which was located 100 to 150 yards off the main highway on a dirt road. He stated that the plaintiff was in the car. The salient details and the implications of this testimony were denied by the plaintiff and by Smith, who denied any wrongdoing whatsoever, and their denials satisfied the master and the court below

that the defendant had not proved his charge that the plaintiff had committed adultery with Smith. We agree with the conclusion reached by the master and by the learned court below.

"The charge of adultery is a serious one, and the proofs must be clear and satisfactory, established by 'clear proofs and imperious reasons', and 'must be of such a clear and convincing character as to leave no other conclusion in the mind of a reasonable person'; Diehl v. Diehl, 87 Pa. Superior Ct. 545, 550; Viale v. Viale, 109 Pa. Superior Ct. 560, 562, 563, 167 A. 437. It is not necessary to prove the direct fact of adultery; for, being committed in secret, it is seldom susceptible of proof except by circumstances which, however, are sufficient whenever they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt: [citing cases]". *Connor v. Connor,* 168 Pa. Superior Ct. 339, 345, 77 A. 2d 697.

The court refused the plaintiff a divorce because she was "chargeable with misconduct approaching indignities" and hence "not the innocent and injured spouse". With that conclusion we are unable to agree.

There is, of course, the requirement that the plaintiff in a divorce action qualify as the "innocent and injured spouse" (Act of May 2, 1929, P. L. 1237, sec. 10 as amended, 23 PS 10); but this does not mean that the plaintiff must be wholly free from fault. *Daly v. Daly,* 137 Pa. Superior Ct. 403, 9 A. 2d 192. It does mean, however, that there can be cases in which the plaintiff may be denied relief because of conduct falling short of grounds for divorce. For example, where the charge is indignities to the person of the plaintiff, the conduct of the plaintiff, while not grounds for divorce, may have provoked the acts complained of. Where the parties are nearly equally at fault, so that neither can clearly be said to be the innocent and injured spouse within the divorce law, neither will be granted a divorce. *Daly v.*

*Daly,* supra; *Hartley v. Hartley,* 154 Pa. Superior Ct. 176, 35 A. 2d 591; *Goshorn v. Goshorn,* 163 Pa. Superior Ct. 621, 63 A. 2d 135. This principle cannot, however, work to the advantage of a defendant guilty of the most serious marital transgression known to the law, against a plaintiff who is, comparatively speaking, wholly free from fault.

The order refusing the divorce is reversed, and the record is remitted to the court below with direction to enter a decree of absolute divorce on the ground of adultery.